**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| RIDGEWOOD WATER,<br><br>      Plaintiff,<br><br>against<br><br>3M COMPANY, E.I. DUPONT DE NEMOURS & COMPANY, THE CHEMOURS COMPANY, HONEYWELL INTERNATIONAL INC., TYCO FIRE PRODUCTS LP, CHEMGUARD, INC., BUCKEYE FIRE EQUIPMENT COMPANY, NATIONAL FOAM, INC., AND DOES 1-50, INCLUSIVE,<br><br>      Defendants. | Civil Action No. _____<br><br>**NOTICE OF REMOVAL**<br><br>**JURY TRIAL DEMANDED** |

  Defendants Tyco Fire Products LP ("Tyco") and Chemguard, Inc. ("Chemguard") by undersigned counsel, hereby give notice of removal of this action, pursuant to 28 U.S.C. §§ 1442, 1442(a)(1) and 1446, to the United States District Court for the District of New Jersey. As grounds for removal, Tyco and Chemguard state as follows:

**PRELIMINARY STATEMENT**

  1.  Plaintiff seeks to hold Tyco, Chemguard, and certain other Defendants liable based in part on their alleged conduct in designing, manufacturing, and selling firefighting chemical agents, aqueous film-forming foam ("AFFF"), which were developed for sale to the United States military and others pursuant to government contracts and in accordance with the military's rigorous specifications. Tyco and Chemguard intend to assert the federal "government contractor" defense in response to Plaintiff's claims. Under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), Tyco and Chemguard are entitled to remove this action in order to have their federal defense adjudicated in a federal forum. Such removal "fulfills the federal officer removal statute's

1

purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

## PLAINTIFF'S SUMMONS & COMPLAINT

2. This action was filed on February 25, 2019, in the Superior Court of New Jersey, Bergen County, bearing Docket No. BER-L-001447-19. (Ex. A, Summons and Complaint.) Venue is proper in this Court pursuant to 28 U.S.C. §§ 112(a) and 1441(a) because the Superior Court of New Jersey, Bergen County, is located within the District of New Jersey.

3. On March 12, 2019, Tyco and Chemguard were served with the initial Summons and Complaint (Ex. A). There have been no further proceedings in this action in the Superior Court of New Jersey, Bergen County.

4. Tyco and Chemguard are not required to notify or obtain the consent of any other Defendant in this action in order to remove Plaintiff's action as a whole under § 1442(a)(1). *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Linden v. Chase Manhattan Corp.*, 1999 WL 518836, at *1 (S.D.N.Y. July 21, 1999); *Torres v. CBS News*, 854 F. Supp. 245 (S.D.N.Y. 1994). Nevertheless, Defendants 3M Company, Honeywell International, Buckeye Fire Equipment Company, and National Foam consent to the removal to this Court. (Exs. B, C, D, E).

5. Plaintiff generally alleges that Defendants have manufactured, marketed, and/or sold products, including AFFF products, containing perfluorooctane sulfonate (PFOS) and/or perfluorooctanoic acid (PFOA) and/or compounds that degrade into those chemicals, which products were used or discharged at various sites in New Jersey. (Compl. ¶¶ 10–11, 14–17, 71).

Plaintiff further alleges that these chemicals have contaminated its drinking water supply. (*id.* ¶¶ 1, 9, 71).

6. Plaintiff asserts claims for negligence (*id.* ¶¶ 101–110), strict products liability (*id.* ¶¶ 74–100), and trespass (*id.* ¶¶ 111–118).

7. Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for Plaintiff, and a copy is being filed with the Clerk of the Superior Court of New Jersey, Bergen County.

8. By filing a Notice of Removal in this matter, Tyco and Chemguard do not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person, or venue, and Tyco and Chemguard specifically reserve the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

9. Tyco and Chemguard reserve the right to amend or supplement this Notice of Removal.

10. If any question arises as to the propriety of the removal of this action, Tyco and Chemguard request the opportunity to present a brief and oral argument in support of removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442(a)(1)

11. Removal here is proper under 28 U.S.C. § 1442(a)(1), which provides for removal when a defendant is sued for acts undertaken at the direction of a federal officer. Removal is appropriate under this provision where the removing defendant establishes that: (1) the defendant is a "person" under the statute; (2) the defendant was "acting under" the direction of a federal officer when it engaged in the allegedly tortious conduct; (3) the defendant was acting "under color of" federal office at the time of the allegedly tortious conduct; and (4) the defendant raises a "colorable" federal defense. *See Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35

(1989); *Papp v. Fore-Kast Sales Co., Inc.*, 842 F.3d 805, 812 (3d Cir. 2016); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Isaacson*, 517 F.3d at 135.

12.     Removal rights under the federal officer removal statute, 28 U.S.C. § 1442, are much broader than under the general removal statute, 28 U.S.C. § 1441.  Suits against defendants acting on behalf of federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson Cty. v. Acker*, 527 U.S. 423, 431 (1999).  This is because § 1442 protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prod.*, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted).  This important federal policy "should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969).  To the contrary, "the statute as a whole must be liberally construed" in favor of removal.  *Isaacson*, 517 F.3d at 136.

13.     All requirements for removal under § 1442(a)(1) are satisfied here.  *Cf.*, *e.g.*, *Ayo v. 3M Co.*, 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in case against Tyco, Chemguard, and other manufacturers of AFFF).

**A.     MilSpec AFFF**

14.     Since the 1960s, the United States military has used AFFF that meets military specifications ("MilSpec AFFF") on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property.  Indeed, the United States Naval Research Laboratory developed AFFF in response to deadly, catastrophic fires aboard the aircraft carriers USS Forrestal in 1967 and USS

4

Enterprise in 1969.[1]  Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[2]

15.     The manufacture and sale of AFFF procured by the military is governed by rigorous military specifications created and administered by Naval Sea Systems Command.[3]  All such AFFF products must be "qualified for listing on the applicable Qualified Products List" prior to military procurement.[4]  Prior to such listing, a "manufacturer's . . . products are examined, tested, and approved to be in conformance with specification requirements."[5]  The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.[6]  After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[7]  Naval Sea Systems Command "reserves the right to perform any of the [quality assurance] inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements."[8]

---

[1] *See* U.S. Naval Research Lab., NRL Press Release 71-09r, *Navy Researchers Apply Science to Fire Fighting* (Oct. 23, 2009), https://tinyurl.com/y2jq4q4w.

[2] U.S. Naval Research Lab., NRL Mem. Rep. 1001-06-8951, The U.S. Naval Research Laboratory (1923-2005): *Fulfilling the Roosevelts' Vision for American Naval Power*, at 37 (June 30, 2006) ("Fulfilling the Roosevelts' Vision"), http://bit.ly/2mujJds.

[3] *See* Mil-F-24385 (1969).  The November 1969 MilSpec and all its revisions and amendments through September 2017 are available at https://tinyurl.com/yxwotjpg.

[4] *Id.* § 3.1.

[5] Dep't of Defense SD-6, Provisions Governing Qualification, at 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[6] *See, e.g.*, Ex. F, MIL-PRF-24385F(2) at 18 (2017)).  The cited MilSpec designates Naval Sea Systems Command as the "Preparing Activity."  The "Preparing Activity" is responsible for qualification. (*See* Dep't of Defense SD-6 at 3.)

[7] Dep't of Defense SD-6 at 1.

[8] *See, e.g.*, Ex. F, MIL-PRF-24385F(2) § 4.1 (2017).

16. The MilSpec has always required that AFFF contain "fluorocarbon surfactants"—the class of chemical compounds that includes PFOA and PFOS.[9] The current MilSpec expressly specifies (subject to recently imposed limits) use of PFOA and PFOS in AFFF formulations.[10]

17. The federal government requires airports providing certain categories of passenger service ("Part 139 airports") to use MilSpec AFFF,[11] and Plaintiff acknowledges that the MilSpec applies to AFFF transactions involving "a federally-regulated airport." *See* Compl. ¶ 41. On July 8, 2004, the FAA issued Advisory Circular 150/5210-6D, which stated that "AFFF agents [used by Part 139 airports] must meet the requirements of Mil-F-24385F."[12] Although the preamble indicated that the circular was for guidance only, on February 8, 2006, the FAA issued a CertAlert clarifying that the MilSpec AFFF requirement was, in fact, mandatory and that "[a]ny AFFF purchased after July 1, 2006 by an airport operator certified under Part 139 must meet [Mil-F-24385F]."[13] The FAA explained:

> There are several reasons for this requirement. First of all, AFFF has to be compatible when mixed. AFFF manufactured by different manufacturers, although meeting the UL 162 standard, may not be compatible. AFFF meeting the Military Specification will always be compatible with other Military Specification AFFF no matter the manufacturer. Second, AFFF meeting the military specification requires less agent than AFFF meeting UL 162 to extinguish the same size fire. Finally, the requirement to use Mil Spec is in concert with the National Fire Protection Association National Fire Code 403, paragraph 5.1.2.1.[14]

---

[9] *See* Mil-F-24385 § 3.2 (1969).

[10] *See* Ex. F, MIL-PRF-24385F(2) § 6.6 & Tables 1, 3 (2017).

[11] Part 139 applies to airports serving scheduled passenger flights by 9-passenger aircraft (or larger) or unscheduled passenger flights by 31-passenger aircraft (or larger). *See* 14 C.F.R. § 139.1 (2019).

[12] FAA Advisory Circular 150/5210-6D, *Aircraft Fire Extinguishing Agents* (July 8, 2004) at 4, https://tinyurl.com/yxpk87ky.

[13] FAA Part 139 CertAlert 06-02, Aqueous Film Forming Foam (AFFF) meeting MIL-F-24385 (Feb. 8, 2006).

[14] *Id.*

18. On September 1, 2016, the FAA issued a superseding CertAlert, which reiterated that "Airport operators must ensure any AFFF purchased after July 1, 2006, meets Mil-Spec standards."[15] Thus, from July 1, 2006 to present,[16] airport operators holding an FAA Airport Operating Certificate have been required to use, with limited exceptions, MilSpec AFFF.

19. Plaintiff alleges that it "cannot identify any military or federally-regulated airport as a source of such PFAS contamination, and on that basis alleges that the PFAS contamination in its wells is not from such sources." Compl. ¶ 68. However, MilSpec AFFF could have been used at any of the sites alleged by Plaintiff. In addition, upon information and belief, a federally-regulated Part 139 airport that is required to use MilSpec AFFF—Teterboro Airport[17] in Teterboro, New Jersey—is a source of the alleged PFOA and/or PFOS contamination that gives rise to Plaintiff's claims.

20. As Plaintiff alleges, "[f]ire suppression and fire-fighting training activities are sources of PFAS releases to the environment, via the discharge of AFFF." *Id.* ¶ 66. Upon information and belief, MilSpec AFFF has been used and released into the environment at Teterboro Airport since at least 2006.

21. Plaintiff alleges that it obtains a portion of its water not only from its own wells but also "via interconnections with other water utilities, including Suez Water New Jersey and

---

[15] FAA Part 139 CertAlert 16-05, Update on Mil-Spec Aqueous Film Forming Foam (AFFF) (Sept. 1, 2016), https://www.faa.gov/airports/airport_safety/certalerts/.

[16] The FAA Reauthorization Act of 2018 provides that, not later than three years after October 5, 2018, the FAA "shall not require the use of fluorinated chemicals to meet the performance standards" referenced in chapter 6 of FAA Advisory Circular 150/5210-6D and acceptable under 14 C.F.R. § 139.319(*l*)). *See* Pub. L. No. 115-254, 132 Stat. 3186, 3273. According to the most recent FAA Part 139 CertAlert, all certificated Part 139 airports are currently "required to use foams that meet military specifications (MIL-PRF-24385)." FAA Part 139 CertAlert 19-01, Aqueous Film Forming Foam (AFFF) Testing at Certificated Part 139 Airports (Jan. 17, 2019), https://tinyurl.com/y3tnn4bk.

[17] FAA Part 139 Airport Certification Status Table, https://tinyurl.com/y4k7vfjh.

Hawthorne Water Department." *Id.* ¶ 8. Plaintiff alleges that the PFOA and PFOS at issue have reached its water supply due in part to the use and disposal of Defendants' PFOA and PFOS products "in the vicinity of locations from which Ridgewood obtains water, including its groundwater wells, *and source sites for imported water*." *Id.* ¶ 71 (emphasis added).

22. Upon information and belief, Suez Water's service area includes Teterboro Airport. One of Suez Water's water sources is the Oradell Reservoir. Teterboro Airport is approximately 7.3 miles away from the Oradell Reservoir, and the flow of groundwater in that area of New Jersey is generally in the direction running from the airport to the reservoir. Suez Water's other surface water sources are also in the general downgradient direction of groundwater flow from Teterboro Airport. In addition, upon information and belief, Teterboro Airport is located approximately 8.9 miles from Glen Rock, New Jersey, one of the municipalities in Plaintiff's service area. *See id.* ¶ 7.

23. Plaintiff lists the Saint-Gobain Performance Plastics facility in Wayne, N.J.—which is not located within the footprint of Plaintiff's well production area or the boundaries of Suez Water New Jersey or the Hawthorne Water Department—as a source "likely to have contributed to" the contamination of Plaintiff's water supply. *Id.* ¶ 65. Yet, upon information and belief, the Saint-Gobain facility is located approximately 8.3 miles from Ridgewood, which is approximately the same distance that Teterboro Airport is from the Village of Ridgewood and farther than Teterboro Airport is from the Oradell Reservoir.

**B.     The "Person" Requirement Is Satisfied**

24. The first requirement for removal under the federal officer removal statute is satisfied here because Tyco (a limited partnership) and Chemguard (a corporation) are "persons" under the statute. For purposes of § 1442(a)(1), the term "person" includes "'companies, associations, firms, [and] partnerships.'" *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1).

8

## C.     The "Acting Under" Requirement Is Satisfied

25.     The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out, the duties or tasks of a federal officer. *Isaacson*, 517 F.3d at 137. "The words 'acting under' are to be interpreted broadly . . . ." *Id.* at 136 (citation omitted). Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained-of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.

26.     The requirement is met here because Plaintiff challenges Defendants' alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself." *Isaacson*, 517 F.3d at 137. MilSpec AFFF is a mission critical military product that, without the support of private contractors, the government would have to produce for itself. *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members); *cf. Isaacson*, 517 F.3d at 137. The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[18] Accordingly, the military has long depended upon outside contractors like Tyco and Chemguard to develop and supply AFFF. *See Ayo*, 2018 WL 4781145, at *8–9 (holding that Tyco, Chemguard, and other AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF).

27.     In designing, manufacturing and supplying the MilSpec AFFF products at issue, Tyco and Chemguard acted under the direction and control of one or more federal officers.

---

[18] *Fulfilling the Roosevelts' Vision*, at 37.

9

Specifically, Tyco and Chemguard acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.[19]  Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the United States Department of Defense.[20]

28.     The applicable MilSpec has always required that AFFF contain constituents from the same class of chemical compounds to which PFOA and PFOS belong.[21]  The current MilSpec expressly specifies (subject to recently imposed limits) use of PFOA and PFOS in AFFF formulations.[22]  Indeed, the September 2017 amendments to the MilSpec recognize that it is not yet technically feasible for manufacturers to completely eliminate PFOA and PFOS "while still meeting all other military specification requirements."[23]

**D.     The Causation Requirement Is Satisfied**

29.     The third requirement, that a defendant's actions were taken "under color of federal office . . . has come to be known as the causation requirement."  *Isaacson*, 517 F.3d at 137 (alteration, citation, and internal quotation marks omitted).  Like the "acting under" requirement, "[t]he hurdle erected by this requirement is quite low."  *Id.*  Courts "credit Defendants' theory of the case when determining whether [this] causal connection exists."  *Id.*[24]

---

[19] *See* Ex. F, MIL-PRF-24385F(2) (2017).

[20] *See* Dep't of Defense, SD-6 at 1.

[21] *See* Mil-F-24385 § 3.2 (1969).

[22] *See* Ex. F, MIL-PRF-24385F(2) § 6.6 & Tables 1, 3 (2017).

[23] *Id.* § 6.6.

[24] The "Acting Under" and "Under Color Of" prongs overlap.  Both "are satisfied if the actions subject to suit resulted directly from government specifications or direction." *Albrecht v. A.O. Smith Water Prod.*, 2011 WL 5109532, at *5 (S.D.N.Y. Oct. 21, 2011).

30.     "To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack . . . occurred *while* Defendants were performing their official duties." *Id.* at 137–38; *Papp*, 842 F.3d at 813 (explaining that in order to meet the causation requirement, it is "sufficient for there to be a connection or association between the act in question and the federal office").

31.     Here, the Plaintiff's claims arise in part from certain Defendants' production and sale of AFFF manufactured to military specifications. Plaintiff alleges that the use of PFOS and PFOA in AFFF rendered Defendants' products defective. Defendants contend that the use of such chemicals was required by military specifications. The conflict is apparent: MilSpec AFFF was developed by the Defendants for use by the military and designed to meet specifications established by the Department of Defense. Part 139 airports, including Teterboro Airport in New Jersey, are required by the government to purchase AFFF that meets MilSpec standards. The design choices Plaintiff is attempting to impose via state tort law would create a conflict in which Defendants could not "comply with both [their] contractual obligations and the state-prescribed duty of care." *Boyle v. United Tech. Corp.*, 487 U.S. 500, 509 (1988); *see also Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'causal connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government.").

### E.     The "Colorable Federal Defense" Requirement Is Satisfied

32.     The fourth requirement ("colorable federal defense") is satisfied by Tyco's and Chemguard's assertion of the government contractor defense.

33.     At the removal stage, a defendant need only show that its government contractor defense is colorable. *Papp*, 842 F.3d 815. "To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried

in federal court." *Isaacson*, 517 F.3d at 139 (citation omitted). At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116 (citing *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006)).[25] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

34.     Under the government contractor defense, the defendant is not liable for alleged defects or negligence with respect to military equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." *Boyle*, 487 U.S. at 512.

35.     Tyco and Chemguard have satisfied these elements for purposes of removal. As discussed above, Naval Sea Systems Command approved reasonably precise specifications, governing AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.[26] Tyco and Chemguard's products appeared on the DOD Qualified Products Listing,[27] which could

---

[25] *See also Kraus v. Alcatel-Lucent*, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage. Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (citation omitted)).

[26] *See* Ex. F, MIL-PRF-24385F(2) (2017).

[27] MIL-F-24385 QPL/QPD History for Type 3 AFFF (June 23, 2016), https://tinyurl.com/y6m9jcxd; MIL-F-24385 QPL/QPD History for Type 6 AFFF (June 23, 2016), https://tinyurl.com/yy3u6vax.

have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec.[28]  *See Ayo*, 2018 WL 4781145, at *13 ("[T]here is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products."); *see also id.* ("There is also colorable evidence … that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications.").

36.     Moreover, the government was adequately informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF.  The military specifications have long included testing protocols and requirements for toxicity, chemical oxygen, and biological demand.[29]  Indeed, it is clear that the United States has long understood that AFFF may contain or break down into PFOS and/or PFOA, that AFFF constituents can migrate through the soil and potentially reach groundwater, and that it has been reported that this may raise environmental or health issues.[30]  For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire fighting exercises are considered to have adverse effects environmentally."[31]  In June 1991, the Air Force stated that past Air Force fire training activities resulted in "adverse environmental

---

[28] *See* Dep't of Defense SD-6 at 1.

[29] *See, e.g.*, MIL-F-24385 §§ 3.16 & 4.7.16 (Rev. A May 2, 1977).

[30] *See, e.g.*, EPA, Revised Draft Hazard Assessment of Perfluorooctanoic Acid and its Salts, at 1–6 (Nov. 4, 2002) (excerpt).

[31] *See Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients*, at 1 (Oct. 1980), http://www.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

impact," including "soil contamination" and the "potential" for "groundwater contamination."[32] More recently, in a November 2017 report to Congress, the Department of Defense acknowledged the concerns raised by the EPA regarding PFOS and PFOA in drinking water. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[33] Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "fluorocarbon surfactants,"[34] and expressly specifies (subject to recently imposed limits) use of "PFOS" and "PFOA" in AFFF formulations.[35] *See Ayo*, 2018 WL 4781145, at \*12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design.").

37. At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See Twinam v. Dow Chem. Co. (In re "Agent Orange" Prod. Liab. Litig.)*, 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht v. A.O. Smith Water Prod.*, 2011 WL 5109532, at \*5 (S.D.N.Y. Oct. 21, 2011) ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)). Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military

---

[32] USAF, Engineering Technical Letter ETL 91-4: Site Selection Criteria for Fire Protection Training Areas, at 1 (June 14, 1991).

[33] Dep't of Defense, Aqueous Film Forming Foam Report to Congress, at 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/y5un3zq8.

[34] Ex. F, MIL-PRF-24385F(2) § 3.2 (2017).

[35] *Id.* § 6.6 & Tables 1, 3.

procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

WHEREFORE, Tyco and Chemguard hereby remove this action from the Superior Court of New Jersey, Bergen County, to this Court.


Dated:  April 11, 2019                     **ARCHER & GREINER P.C.**

                                          By: */s/ Thomas J. Herten*
                                              Thomas J. Herten
                                              Nicole G. McDonough
                                              Court Plaza South, West Wing
                                              21 Main Street, Suite 353
                                              Hackensack, NJ 07601
                                              201-498-8502
                                              therten@archerlaw.com
                                              nmcdonough@archerlaw.com


                                              *Attorneys for Defendants*
                                              *Tyco Fire Products LP and Chemguard, Inc.*


216254337v1